ANDERSON v. AKERS et al.

No. 649.

District Court, W. D. Kentucky.

May 28, 1935.

Locke, Locke, Stroud & Randolph, of Dallas, Tex., and Peter, Lee, Tabb, Krieger & Heyburn, of Louisville, Ky., for plaintiff.

Henry E. McElwain, Jr., Thomas A. Barker, John C. Doolan, William W. Crawford, Allen P. Dodd, A. C. VanWinkle, Graddy Cary, Henry J. Tilford, H. H. Nettelroth, John J. Davis, Hugh B. Fleece, J. Wheeler Campbell, T. Kennedy Helm, Churchill Humphrey, and Frederic M. Sackett, all of Louisville, Ky., and Newton D. Baker and Howard F. Burns, both of Cleveland, Ohio, for defendants.

TUTTLE, District Judge.

This cause is now before the court on settlement of the decree. The parties have, in a commendable spirit of co-operation and effort to assist the court and expedite the proceedings, submitted drafts of proposed decree and briefs in connection therewith, all of which have received careful consideration by the court. In so far as it seems necessary or desirable, the matters argued in these briefs will now be briefly noted in this supplemental opinion.

### Bankruptcy of Defendant Hieatt.

In the opinion on rehearing the question whether the liability of defendant Hieatt has been affected by his discharge in bankruptcy during the pendency of this cause was reserved for future argument and determination, and that question has now been covered by briefs. This defendant filed a voluntary petition in bankruptcy in June, 1932, after the commencement of this suit, and in the same month was adjudicated a bankrupt. He was granted his discharge in bankruptcy in May, 1934, having duly scheduled his alleged liability involved in this cause, but no claim thereon having been filed in the bankruptcy proceeding. That proceeding was closed on June 8, 1934. The said defendant urges his discharge in bankruptcy as a defense here. Section 35, 11 USCA (section 17 of the Bankruptcy Act), provides that "a discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as" are specifically excepted by said section. To be discharged, therefore, the liability of this defendant herein must have been a "provable debt." Whether it was such must be determined by a consideration of section 63a of the Bankruptcy Act (11 USCA § 103 (a), which specifies the various kinds of debts which are provable in bankruptcy. The only provisions of that section which could conceivably be regarded as applicable to the debt here involved are subdivision (4) and subdivision (6½), as added by Act June 7, 1934, 11 USCA § 103 (a) (4, 6½).

■ Subdivision (4) refers to debts "founded upon * * * a contract express or implied," as being provable debts. The liability of this defendant herein being based upon a statute, the question arises whether such a statutory liability constitutes a debt founded upon "a contract." This question has, in my opinion, already been answered in the negative by the United States Supreme Court. McClaine v. Rankin, 197 U. S. 154, 25 S. Ct. 410, 49 L. Ed. 702, 3 Ann. Cas. 500; Holman v. Clark (D. C.) 48 F.(2d) 253.

■ Subdivision (6½) of said section 63a of the Bankruptcy Act makes provable in bankruptcy "the amount of any damages, as evidenced by a judgment of a court of competent jurisdiction, in any action for negligence instituted prior to adjudication of defendant in such action in bankruptcy and pending at the time of the filing of petition in bankruptcy, whether voluntary or involuntary." This subdivision was added to the section by an amendment enacted by Congress on June 7, 1934 (48 St. p. 923, 11 USCA § 103 (a) (6½), after this defendant had received his discharge in bankruptcy and one day before the closing of his bankruptcy estate. Said estate, therefore, was pending at the time of the adoption of this amendment and the question is presented as to whether said amendment is applicable to an estate pending at such time. An amendment to the Bankruptcy Act will be construed as not intended to apply, and therefore as inapplicable, to bankruptcy estates pending at the time of its enactment unless the amendatory act clearly indicates that it was the intention of Congress to make it applicable to such estates. Holt v. Henley, 232 U. S. 637, 34 S. Ct. 459, 58 L. Ed. 767; In re United States Restaurant & Realty Co., 187 F. 118 (C. C. A. 2); In re Wyatt (D. C.) 23 F. (2d) 350; 59 Corpus Juris, p. 1174, and cases there cited, where the correct rule was stated as follows: "No statute should be so construed as to give it a retroactive effect so as to affect pending litigation, unless a clear intent to the contrary is plainly manifest, either by express declaration or necessary implication."

There is nothing in the amendatory act here involved which tends to indicate any such intention on the part of Congress. On the contrary, this act, after adding three new subdivisions, namely, (6), (6½), and (7), to section 63a (11 USCA § 103 (a), expressly provided that said subdivisions (6) and (7) "shall apply to estates pending at the time of the enactment of this amendatory act [on June 7, 1934]," (11 USCA §§ 103 (a), 103a), but contained no such provision with respect to subdivision (6½). Under the familiar rule of expressio unius est exclusio alterius, therefore, it seems clear that Congress did not intend that this

amendment should apply to estates, such as that here involved, already pending at the time of the enactment of such amendment. Assuming, therefore, that the decree herein will constitute a "judgment" in an "action for negligence" within the meaning of said subdivision (6½), the liability of this defendant thereon was not, when he received his discharge, a "provable debt," and hence for that reason alone was not affected by such discharge. There is, therefore, no occasion to determine whether if this debt were a provable debt it would be a "lawful and malicious injury to the person or the property of another" or would otherwise be excepted from the effect of such discharge by section 35, 11 USCA, section 17 of the Bankruptcy Act already mentioned. The contention of the defendant to the contrary must be overruled.

### Kentucky Wagon Manufacturing Company.

The arguments now presented by the defendants Humphrey and Crawford in support of their contentions of non-liability in connection with the transactions involving the Kentucky Wagon Manufacturing Company have been carefully considered by the court and the applicable portions of the record have been re-examined, with the result that I find no reason to modify any of the findings of fact or conclusions of law on this subject set forth in my previous opinions. It seems unnecessary to here repeat or review those findings and conclusions. It is sufficient to refer to them as expressing views and rulings to which I still adhere.

### Wakefield & Co.

Certain defendants were, in the previous opinions herein, found liable for losses resulting from loans by the bank to Wakefield & Co. made after such defendants had received, but ignored, notice of a certain bank examiner's report showing that the bank had made loans, nominally to certain employees of Wakefield & Co., which were in reality illegally excessive loans to said company. These defendants now urge that because this particular examiner's report mentioned only some, but not all, of the employees of Wakefield & Co. to whom the bank made such loans, therefore the failure of such defendants to heed such notice did not render them liable for loans thereafter made to Wakefield & Co. in the name of one of its employees not so mentioned in said report. I am unable to agree with this contention. It seems plain that

the notice in question was notice that the bank was making excessive loans to Wakefield & Co. through the device of loans ostensibly made to various of its employees, and that the mere fact that this particular report referred to the names of less than all of such employees is wholly immaterial to the question whether these defendants were thereby put on inquiry concerning the practice of the bank in thus evading the statutory prohibition against excessive loans (12 USCA § 84). Manifestly, if these defendants had then properly performed this duty of inquiry, they would have learned the true state of affairs and the names of all of the employees involved, and should, and presumably would, not only have informed their codirectors in regard thereto, but have taken the necessary action to prevent the continuance thereof. I am satisfied, and I find, that all of the subsequent loans to Wakefield & Co. here involved were the natural and probable result of this dereliction of duty on the part of these defendants, and that the latter are therefore liable therefor, whether or not they expressly approved or actually knew of such loans, but, of course, only to the extent that said loans represented fresh outlays of money and not mere renewals of previous loans, such, for example, as the note for $200,000 outstanding at the close of the bank and apparently conceded by the plaintiff in his last brief to be traceable into a loan existing at the time of the notice in question.

### Murray Rubber Company.

It is urged by the nonofficer defendants that even under the terms of the former opinions herein no such defendant is liable for any loan made by the bank to the Murray Rubber Company not shown to have been specifically approved by him, so that, inasmuch as it appears from the record that certain of such loans were approved at meetings not attended by various of these defendants, and have not been shown to have been otherwise specifically approved by them, they are not liable for the making of these particular loans. The plaintiff, on the other hand, argues that as all of these defendants regularly and as a matter of course and routine assented to the making of numerous loans to this debtor without regard to the fact that its indebtedness to the bank then already exceeded the legal maximum of permitted loans to a single debtor, all excessive loans

subsequently made to such debtor should be considered as made pursuant to the practice thus permitted by said defendants, so that no such defendant who so participated in such practice should be excused from liability for any loan merely because he was absent from the meeting at which it was submitted to the board of directors for approval and approved in accordance with the already sanctioned practice; and, furthermore, that if a defendant director so absent from a meeting at which excessive loans were made to the Murray Rubber Company were present at subsequent meetings at which additional excessive loans, further increasing the excessive indebtedness of said company, were approved by him, such defendant must be deemed to have thereby assented to such previous loans. I am unable to agree with these contentions of plaintiff. It seems to me that the mere approval by any of the defendant directors of one or more excessive loans to this debtor did not constitute a knowing participation in, or assent to, the making by the bank of any subsequent loan to such debtor, within the meaning of the statutory provision here involved (12 USCA § 93). Nor can I think that the mere approval of any such subsequent loan, even with knowledge of the making of a previous loan, amounted to an approval of such previous loan so as to constitute such a knowing participation in, or assent to, it. All this seems to me too clear to require further discussion. The contentions of the plaintiff to the contrary must be overruled and those of the defendants sustained.

### E. B. Norman & Co.

I find in the supplemental briefs no new contentions or arguments requiring discussion here with respect to the loans by the bank to E. B. Norman & Co. It is, therefore, unnecessary to now comment upon this subject further than to refer to my previous opinions as still expressing my findings of fact and conclusions of law on such subject.

### BancoKentucky Company.

In view of the insistent contention of the nonofficer defendants that they should not be held liable for any of the loans of the bank on the security of stock in the BancoKentucky Company not shown to have been specifically approved by them at meetings of the board of directors of the bank, I have again carefully considered the question as to the extent to which such loans were approved by such defendants, and I have re-examined numerous portions of the record bearing on that question. I have, however, found no reason to doubt the correctness of the findings and conclusions on this subject set forth in the opinions heretofore filed, nor to alter any of such findings or conclusions. Without reciting the evidence in detail, it is sufficient to point out that the testimony, the exhibits, and the irresistible inferences therefrom, relative to the facts and circumstances preceding and surrounding the making of these loans, fully establish the fact that all of such loans resulting in the losses here involved were made by the bank pursuant to, and as a result of, a comprehensive policy, known and assented to by all of the defendants in question, and prompted, at least in part, by their desire to promote the sale of the stock of the newly organized BancoKentucky Company in whose success they were keenly interested, and, to that end, to finance subscriptions for such stock, a substantial amount of which stock subscriptions were so financed by the bank. The mere fact, therefore, that any particular defendant is not shown to have gone through the formality or form of vocally expressing specific approval of any particular one or more of these loans does not, in my opinion, affect his liability for the making of such loan. I adhere to my views, findings, and conclusions on this subject as stated in my previous opinions, and the contentions of the defendants in this connection are overruled.

### Allowance of Interest.

In the first opinion herein, this court, within its discretion, fixed the date at which interest should begin to run on the amounts due as the date of the filing of the bill of complaint in this suit. The fixing of such date is clearly a matter for the sound discretion of this court. It seems plain that in a case of this kind when interest does begin to run it should be at the legal rate of interest fixed by the state of the forum, which rate of interest in this case is 6 per cent.

The question as to the date when that interest shall begin to run is a more difficult and complicated problem for the exercise of discretion. Exercising my discretion, I have decided to change that date from the time of the filing of the bill to the date on which the decree is entered.

14

My reasons for altering my views and exercising my discretion in this particular way are threefold. First, no bad faith has been found, either by the master or by me, as to the conduct of any of the nonofficer defendants. Second, while, on final accounting and decree and after the taking of the testimony of many witnesses and the examination of many records, this court is now able to make a decree which is definite and specific as to amounts, heretofore this problem was so complex and complicated, both as to the law and as to the facts, that it was impossible, as a practical matter, for any of the interested parties, or for any judicial officer, to name any definite amount understandingly and with a reasonable degree of certainty. Third, the delay which has resulted, from the date of the filing of the bill until the day when the final decree is entered, has not been through the fault of the defendants or of counsel for the defendants. I do not intend by this to suggest that such delay is in any degree due to fault on the part of the plaintiff or of counsel for the plaintiff. The case is so involved, and covers such a vast extent of time and property and details, that it is only as a result of fine cooperation on the part of the plaintiff and his counsel and the defendants and their counsel that this court will be able to enter this definite decree at this time. There has been no unnecessary delay, from the time when the bill was filed until the present time. The volume of the evidence indicates that the special master proceeded promptly and diligently with his work and promptly thereafter filed his report. Counsel promptly took exceptions thereto. It was necessary to call in a judge from another district to hear the case. Counsel co-operated with the court in having a prompt hearing on the exceptions to the master's report. It was necessary to file extensive and exhaustive briefs and within a short time after the last of such briefs was filed this court filed an opinion. Counsel for defendants were fully justified in their motion for a rehearing. This involved the filing of further extensive briefs and promptly after the last of those briefs had been filed this court filed a second opinion. Then the work of formulating the final decree began and necessitated the filing of additional briefs, the last of which was not filed until in March of this year. This made it necessary for this court to again review the record and briefs in order to prepare this opinion and enter the decree.

For these reasons, it is my opinion that I should exercise my judicial discretion on this subject in favor of these defendants and that interest on the amounts found to be due should be allowed (at the rate of 6 per cent. per annum) only from the date of the entry of the decree. Bates v. Dresser, 251 U. S. 524, 40 S. Ct. 247, 64 L. Ed. 388.

### Rulings on Exceptions.

Counsel have now raised the question as to whether the court should specifically overrule or sustain each individual exception taken by the parties to the master's report. The two opinions already filed by this court sufficiently indicate the findings of fact and conclusions of law necessary for the shaping and entering of a decree and sufficiently show the extent to which this court has sustained or overruled the report of the master. The detailed question as to whether this court has overruled or sustained each specific exception taken to the master's report will become important only in connection with the taxation of costs. Counsel have seen fit to file many exceptions which are each divided into numerous subdivisions. The question may arise as to whether in taxing costs each of these exceptions so subdivided should be treated as one exception or whether each subdivision should be treated as a separate exception. The holding of the court is that an exception shall be considered as consisting of an assignment of error, pointing out a specific, definite error as having been made by the master, to which counsel may attach many subdivisions, assigning various reasons as to why the action of the master complained of was erroneous. Regardless of the number of such reasons so assigned by counsel as to why the particular action of the master was error, they shall be considered together as constituting only one exception and the costs shall be taxed on that theory. On the other hand, even though counsel may have seen fit to call an assignment of error a single exception, if in it or in any of its so-called subdivisions several distinct errors on the part of the master are alleged, each such allegation of error shall be treated as a separate exception.

### Findings and Conclusions under Rule 70½.

Counsel for the nonofficer defendants have filed numerous requests for findings

of fact and conclusions of law. It is the intention of the court that the opinions filed in this case and the decree shall express and constitute the findings of fact and conclusions of law made by this court in compliance with General Equity Rule 70½ (28 USCA following section 723), as interpreted by the Circuit Court of Appeals for this Circuit. Briggs v. United States, 45 F.(2d) 479 (C. C. A. 6); Lewys v. O'Neill (D. C.) 49 F.(2d) 603, 618; Hazeltine Corporation v. Radio Corporation (D. C.) 52 F.(2d) 504, 512.

Counsel for plaintiff have not by brief or otherwise indicated definite and specific objections to individual requests for findings of fact made by counsel for defendants, although objecting generally to the correctness and completeness of such requests. This record consists of more than 7,000 printed pages and many hundreds of exhibits. It would be possible for the court to make so many individual findings of fact and conclusions of law that they would become a burden to a reviewing court and tend to the confusion, rather than the assistance, of such court. With this thought in mind, the court requests that, if counsel for defendants wish to insist upon separate findings of fact and conclusions of law in addition to those covered by the opinion and decree, they limit them to the smallest number which they feel will fully protect the defendants, and indicate, by page, line, and exhibit number, all portions of the record on which they rely for a particular request, and that counsel for plaintiff in the same manner indicate, by page, line, and exhibit number, the portion of the record upon which they base their objection to a particular finding. The decree will be entered without waiting for such drafts in order to avoid further delay in this complicated suit. If counsel desire the further findings of fact and conclusions of law, counsel are urged to take prompt action in conformity with this suggestion. Counsel for defendants have, in filing their aforesaid requests, apparently already complied, at least partially, with this suggestion, but it is the intention of the court that they shall have further opportunity to fully comply therewith. A further suggestion of the court is that without waiving the right to review in the appellate courts an effort be made by counsel for the respective parties to come to an agreement as to the exact language of any finding or conclusion requested and as to whether or not such request should be refused or granted in view of the findings and conclusions expressed in said opinions and decree.